**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| UNITED STATES OF AMERICA *EX REL.* FRANCIS X. HETHERINGTON and STEPHEN W. SEARLE, and FRANCIS X. HETHERINGTON and STEPHEN W. SEARLE, individually, <br><br> Relators, <br><br> v. <br><br> DELOITTE CONSULTING, LLP and DELOITTE LLP, <br><br> Defendants. | **CASE NO.:** <br> *1:16-cv-1707* <br> **FILED *IN CAMERA* UNDER SEAL** <br><br> **JURY TRIAL DEMANDED** <br><br> **FILED SCRANTON** <br><br> AUG 1 6 2016 <br><br> PER _____ DEPUTY CLERK |

**ORIGINAL FALSE CLAIMS ACT COMPLAINT**

Plaintiff-Relators Francis X. Hetherington ("Relator FXH") and Stephen W. Searle ("Relator SWS") (collectively "Relators" or "Plaintiffs"), by and through their undersigned attorneys, allege as follows, based upon personal knowledge and relevant documents, in support of their claims brought under the *qui tam* provisions of the False Claims Act ("FCA") against Defendants Deloitte LLP and Deloitte Consulting, LLP (collectively "Defendants"):

I. **INTRODUCTION**

1.      Relators bring this action to recover damages and civil penalties on behalf of the United States of America (the "United States") in connection with, *inter alia*, false claims, statements and/or records presented by, and caused to be presented by, Defendants.

2.      The *qui tam* provisions of FCA, 31 U.S.C. §3729, *et seq.* vest Relators with standing to commence this action on behalf of the United States, and themselves individually.

3. The false claims, statements and records which form the basis of Relators' *qui tam claims* arise in principal part out of Defendants' systematic overbillings for Internet Technology ("IT") consulting services provided pursuant to contracts the Commonwealth of Pennsylvania (the "Commonwealth") which are funded entirely or almost entirely by the federal government.

4. As a direct, proximate and foreseeable result of Defendants' fraudulent course of conduct, Defendants knowingly submitted and/or caused to be submitted false or fraudulent claims, statements and records, with the purpose and intent to inflate receiptsunder federally-funded contracts, since at least 2006.

5. Moreover, Defendants purposefully concealed their conduct to avoid their obligation to repay their unlawfully inflated receiptsto the federal government.

6. Despite Relator FXH's persistent effort to halt Defendants' fraudulent billing practices by attempting to alert the Commonwealth to Defendants' duplicity, Defendants' practices continue unabated as of the filing of this Original Complaint.

7. This suit is not based on a prior public disclosure of allegations or transactions in a federal criminal, civil, or administrative hearing in which the government or its agent was a party, in a congressional, Government Accountability Office, or other federal report, hearing, audit, or investigation; in the news media; or in any other location as the term "publicly disclosed" is defined in 31 U.S.C. § 3730(e)(4)(A), as amended.[1]

---

[1] In March 2010, Congress enacted the Patient Protection and Affordable Care Act ("PPACA"), Pub. L. 111-148, §10104(j)(2), 124 Stat. 119 (2010), pursuant to which to the FCA's definition of "public disclosure" and "original source," as set forth in 31 U.S.C. § 30730(e)(4)(A) and (B) respectively, were amended. The definitions of these terms as amended apply to the claims alleged in this Original Complaint action, since they are the operative definitions as of the date of the filing of this action, and further, because Defendants' conduct violative of the FCA continued years after the PPACA took effect. Even if these terms as defined prior to the PPACA amendments could be deemed to apply in whole or in part to claims alleged herein, which at most would be discrete claims arising from conduct that predated

8.     To the extent there has been a public disclosure unknown to Relators, they are each an "original source" as that term is defined under Section 3730(e)(4)(A), as amended.[2] Relators provided the information upon which this action is based prior to any alleged public disclosure.   Further, the wealth of knowledge, information and evidence which Relators voluntarily provided to the Government before filing this action is independent of, and would necessarily materially add to, any ostensible prior public disclosure of the fraud they allege herein.

9.     Specifically, Relators voluntarily disclosed the information that forms the basis of their qui tam allegations in this Original Complaint to the Government before filing the instant action during, *inter alia,* two in-person multi-hour pre-filing interviews with an Assistant United States Attorney ("AUSA") in this District.

10.     In accord with the requirements of the FCA 31 U.S.C. § 3730(b)(2), Relators filed this Original Complaint under seal, and will not serve it upon Defendants until the Court so Orders.   Relators shall serve a copy of this Original Complaint, and a written disclosure of substantially all material evidence and information in Relators' possession, on the United States contemporaneously in the time and manner specified in Fed.R.Civ.P. 4(i), as the FCA, 31 U.S.C. § 3730(b)(2) requires.

11.     Relators incorporate by reference their pre-filing disclosures, their Disclosure Statement, including all attached exhibits, and all supplements and additions thereto.

## II.   JURISDICTION AND VENUE

12.     This Court has jurisdiction over all stated causes of action pursuant to 28 U.S.C. § 1331, in that this action arises under the laws of the United States, and pursuant to 31 U.S.C. §

---

the PPACA, there was no qualifying "public disclosure" as that term was previously defined and in any event, Relators are "original sources" as defined prior to the PPACA.
[2] See footnote 1.

3732, which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730.

13.     Venue is proper in this judicial district pursuant to 31 U.S.C. §3732(a) and 28 U.S.C. §§ 1391(b)(1), (b)(3) and (c) because the Defendants or their affiliated entities can be found in, and transact business in, this judicial district, and because transactions and occurrences which give rise to Relator's *qui tam* claims occurred in this District.

## III.    PARTIES

14.     Relator FXH is an adult individual who resides within this District.  Relator FXH's history of performing IT services for the Commonwealth pursuant to Commonwealth contracts dates back to 2004.  As directly relevant to the *qui tam* claims alleged herein, in 2012, Relator FXH commenced work as an employee of a Commonwealth IT contractor in the capacity Project Manager with oversight over several large-scale multi-million dollar IT and business projects for the Department of Human Services[3] (hereafter "PADHS").  The same year, Deloitte commenced work as the primary vendor on the multi-hundred million-dollar 16-09 project, which was among the projects within Relator FXH's Project Management responsibilities.  In addition, the scope of Relator FXH's work entailed assisting PADHS staff to identify key process and operational improvements for PADHS's computer systems, which similarly overlapped with the scope of Deloitte's work on the 16-09 contract.  Thus, Relator FXH was perfectly positioned and possessed the requite knowledge and expertise in IT matters to identify the mendacious, large scale fraud Defendants were perpetrating on the Commonwealth, the United States and, in the end, the US Taxpayer.  Now, in the capacity of *qui tam* relator, he remains perfectly positioned to assist the United States in recouping the tens of millions of

---

[3]On or about April 30, 2015, the Department of Public Welfare ("DPW") changed its name to PADHS. The acronyms PADHS and DPW will hereinafter be used interchangeably.

dollars Defendants misappropriated from the United States, by virtue of his abundant first-hand knowledge and particularized expertise in the industry.

15.     For these reasons, among others, Relator FXH is also an original source of the information upon which the Original Complaint is based. Relator voluntarily disclosed the information that forms the basis of the allegations in this Original Complaint to the Government before filing the instant action. Indeed, among other things, Relator voluntarily contacted the US Attorney's Office for this District to report Defendants' fraud. He, along with co-Relator SWS, have had two in-person interviews with an Assistant United States Attorney ("AUSA") in this District at which time Relators disclosed the information before filing of this Original Complaint.

16.     Relator SWS is an adult individual who resides within the Commonwealth. Relator SWS is a team project manager and an account manager for a preferred PADHS vendor. This vendor has been awarded multiple IT services contracts with the Commonwealth, including a portion of the 16-09 contract. In this capacity, he works collaboratively with Deloitte staff and the Commonwealth on large IT projects and the day-to-day maintenance of the IT systems that support the Bureau of Child Support Enforcement. Relator SWS gained exhaustive knowledge of Defendants' schemes while working side-by-side with Deloitte staff actively engaged in the fraud. Based on his particularized firsthand knowledge and information, coupled with his largely unfettered access to non-public evidence and information and breadth of experience working on PADHS/Bureau of Child Support Enforcement IT projects, Relator SWS possesses invaluable information of, and material evidence of, the unique facts, theories, and issues set forth in this Original Complaint.

17.     Defendant Deloitte Consulting, LLP (hereinafter "Deloitte") is a Delaware corporation headquartered in New York, New York. Deloitte is a wholly-owned subsidiary of

5

Deloitte, LLP. Deloitte has an office located at 300 Corporate Center Drive, 6th Floor, Camp Hill, PA 17011, which it uses to service its various contracts with PADHS, including those specifically at issue in this Original Complaint, including but not limited to, the 16-09 contract.

18.     Defendant Deloitte LLP, formerly known as Deloitte & Touche USA LLP, was founded in 1995 and is based in New York, New York. Deloitte LLP is responsible for coordinating the activities of its subsidiaries, including Deloitte. Upon information and belief, Defendant Deloitte LLP is a Delaware corporation licensed to conduct business in New York, with a global corporate headquarters at 1633 Broadway, New York, NY 10019.

19.     References to "Deloitte" in this Original Complaint shall include any and all of Defendants' affiliated companies and entities that provide IT services to PADHS as primary contractors pursuant to direct contracts or as subcontractors pursuant to subcontracts during the relevant time period, specifically 2006 through the present.

## IV.     THE FALSE CLAIMS ACT

20.     The federal False Claims Act (the "FCA") imposes liability on any person or corporation that knowingly:

- presents or causes to be presented a false or fraudulent claim to the United States government for payment or approval (31 U.S.C. § 3729(a)(1)(A));

- makes, uses, or causes to be made or used, - a false record or statement material to a false claim (31 U.S.C. § 3729(a)(1)(B)); and/or,

- makes, uses or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the United States government, or any person that conceals or improperly avoids or decreases an obligation to pay or transmit money or property to the United States government (31 U.S.C. § 3729(a)(1)(G)).

21.     Any person or corporate entity who violates any of the aforementioned provisions of the FCA is liable not just for return of all payments falsely made, but also for civil penalties of up to $11,000 per false claim, and for three (3) times the amount of the damages sustained by the federal government. 31 U.S.C. § 3729(a).

22.     The FCA defines a "claim" to include any request or demand, whether under a contract or otherwise, for money or property *which is made to a contractor, grantee, or other recipient if the United States Government provides any portion of the money or property which is requested or demanded,* or if the Government will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested.   31 U.S.C. § 3729(b)(2)(A) (emphasis added).

23.     The FCA defines the terms "knowing" and "knowingly" to "(A) mean that a person, with respect to information – (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information; and (B) require no proof of specific intent to defraud." 31 U.S.C. § 3729(b)(2006) and 31 U.S.C. §3729(b)(1) (West 2010).

24.     The FCA defines the term "material" as "...having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." *Id.* at § 3729(b)(4).

25.     The FCA defines "obligation" to mean "...an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment." *Id.* at § 3729(b)(3).[4]

---

[4] FCA §§ 3729(a)(2)(B) and (G) (previously 3729(a)(2) and (7), respectively), 3729(b)(2)(A) (previously 31 U.S.C. § 3729(c) (2006)) and 31 U.S.C. §3729(b)(3) (West 2010) (no prior version, definition added by FERA) were

## V.    SUMMARY OF THE CLAIMS ALLEGED

26.    Deloitte provides IT and business consulting services, and software design, development, testing and deployment testing to the federal government and to various states and their agencies, including the Commonwealth and PADHS under government contracts.

27.    Over the course of a business relationship that spans nearly four (4) decades, Deloitte cultivated a deeply-rooted working relationship with the Commonwealth, and PADHS in particular. Over this time, Deloitte gained the unquestioned trust and confidence of key decision-makers which in turn Deloitte has parlayed into a virtual monopoly on PADHS IT consulting services contracts.

28.    In Pennsylvania, and in other states as well, Deloitte is engaged under multiple, co-existing contracts with the same and different state agencies which it services concomitantly, pursuant to which Deloitte generates hundreds of millions of dollars a year in revenues. Importantly, Deloitte is fully aware that payment for the IT services it has and continues to render is derived from federal-funds paid by PADHS and other state agencies in whole or in part out of federal funds which the Commonwealth solicits and receives from multiple federal funding sources.

29.    Nonetheless, since at least 2006 and continuing through the present day, Defendants engaged in an ongoing, systematic scheme to inflate both the fixed price and time and materials payments they derive from these federally-funded Commonwealth contracts.

30.    An integral part of Deloitte's scheme, Relators have reason to believe, and therefore aver, involves the submission of false and fraudulent bid proposals calculated to secure Commonwealth contracts at an based on terms that are inflated but which Deloitte has every intention to inflate even more

---

renumbered and amended on May 20, 2009 by the Fraud Enforcement and Recovery Act of 2009 (FERA). The FERA amendments became effective on that date, with the exception of the amendment to 3729(a)(2)(B) (previously 3729(a)(2)), which by its express terms applies retroactively to June 7, 2008 and thereafter. The FCA as amended by FERA applies in this Action since the Original Complaint is filed long after the effective date of FERA, the conduct at issue was an ongoing continuous scheme pursuant to which the underlying conduct has predominantly occurred after May 20, 2009. However, to the extent the pre-FERA FCA is deemed to apply to any aspect of Relator's claims, the Original Complaint should be construed to assert claims, and apply the definitions, pursuant to both the pre and post FERA FCA.

by renegotiating the contract terms during its performance thereunder. In sum, Deloitte submits invoices among other documentation material to the invoicing process for its supposedly fixed price work, as well as "modification and enhancement" (hereafter "M&E") work which the Commonwealth pays for on a hourly basis. Deloitte materially overstates the amount of hours Defendants' staff works on Commonwealth projects, the work actually performed, the quality of the products and services rendered and the amount of reimbursement to which they are entitled. Furthermore, Defendants submit false claims and records replete with misrepresentations and mischaracterizations of the work actually needed in order to further inflate the reimbursements received for M&E work billed at hourly rates.

31.     Deloitte's success in its overbilling scheme perpetrated over many years and many Commonwealth contracts is due in large part to its ability to exploit the trust and confidence of Commonwealth employees charged with managing the scope and cost of Deloitte's contracts and leverage the PADHS staff's substantially insufficient abilities and technical knowledge regarding the nature, scope and necessity of Deloitte's work

32.     As a result, Deloitte generates through fraud additional revenues by fraudulently billing the Commonwealth for M&E for work that is beyond the scope of its contracts or which is not billable as hourly M&E work because that work is encompassed within the scope of the fixed price terms of the contract, unbeknownst to Commonwealth decision-makers.

33.     In fact, as is alleged in detail herein, the bulk of Deloitte's revenues under Commonwealth contracts are generated by Deloitte through false and fraudulent M&E invoicing.

34.     Relators believe and therefore aver that Deloitte submits bid proposals that are artificially low for the purpose of winning Commonwealth contracts, and having no intention to honor the terms upon which it induced the Commonwealth's contract award. Instead, Deloitte has

successfully secured a succession of multi-hundred million dollar contracts which are based on: (a) Defendants' superior knowledge gained from the position as incumbent bidder; and (b) more generally, their decades of experience as the Commonwealth's virtually exclusive vendor for complex IT projects, which fostered PADHS to become highly dependent upon and unduly influenced by Defendant PADHS's high level of dependency on Deloitte, which Deloitte willfully exploits. Deloitte submits bid proposals with the intention of agreeing to whatever terms it believes will win the contract, while having no intention to perform pursuant to those terms. Instead, Defendants submit their falsified proposals well knowing they will induce the Commonwealth to renegotiate the terms favorable to Deloitte after the contract is awarded, by virtue of its position of undue influence and its track record of success in so doing with respect to innumerable contracts over several decades.

35.    The successful renegotiation of the Lot 6 and 7 Contract accomplished through three contract amendments executed in quick succession, each of which reset the contract terms in a manner increasingly favorable to Deloitte, as is alleged in detail *infra,* typify Defendants' pattern and course of fraudulent conduct.

36.    Relators have personal knowledge, evidence and information of the following practices routinely engaged in by Deloitte:

- Submitting bid proposals constructed with inordinately low figures in order to beat out competing bid proposals, with the purpose and intent and full confidence that amendments to the resulting contract will greatly increase the scale and complexity of the solutions to be delivered and in turn substantially expand Deloitte's revenue potential for M&E work for which Deloitte is paid on an hourly basis

- Falsifying documents and records (including costing sheets, work plans and work orders)

10

supplied to the government upon which the government relied in approving work orders, work plans, costing sheets and invoices;

- charging for labor hours that were not performed, which resulted in Deloitte overbillings for fixed price and M&E work; charging for labor hours not performed and inflating hours for work that was performed;

- overcharging the Commonwealth for labor costs by demanding hourly payment for M&E work that Deloitte knew was covered within the fixed price of the contract, including but not limited to staff hours spent fixing defects in the course of the 16-09 contract that arose as a direct result of Deloitte's own negligence

- Causing the Commonwealth to submit false and fraudulent claims to the United States seeking hundreds of millions of dollars of funding for Deloitte's inflated labor costs;

- Using insider information to gain an unfair bidding advantage, which among other things assisted in Deloitte's scheme to manage its bids to inflate fixed price payments without risk of pricing itself out of low bidder status;

- Failing to disclose material conflicts of interest that irretrievably tainted the competitive bidding process and enabled Deloitte to submit winning bids at inflated prices.

37. Defendants' systemic and fraudulent billing patterns and practices, false and fraudulent certifications of records and statements, their manipulative and deceptive recordkeeping, and their willful disregard for contractual obligations, as are more fully described in this Original Complaint, directly and proximately caused the United States to pay more money than is owed to subsidize Deloitte's inflated invoices to the Commonwealth. As such, Defendants' unlawful conduct violates the FCA.

38. Accordingly, Relators seek the full panoply of remedies available under the FCA in order for the federal government, the public fisc. and US Taxpayers to be made whole.

11

## VI.   FEDERAL FUNDING SOURCES FOR STATE IT PROJECTS TO BUILD AND/OR UPDATE IT SYSTEMS

39.    The United States Department of Health and Human Services (USDHHS) provides national leadership and direction in planning, managing, and coordinating the nationwide administration and financing of comprehensive State public assistance systems to support programs for children and families.

40.    USDHHS is therefore charged with the broad responsibility of ensuring each state has reliable, secure, and technologically up-to-date IT systems, equipment and staff.  To discharge this responsibility, USDHHS provides financial and technical support to State governments for the construction, improvement, modernization and preservation of their IT systems.  These responsibilities include the review and approval of state requests for federal financial participation ("FFP") in the cost of such projects, which includes the cost of paying consultants such as Deloitte to build automated data processing services and equipment ("ADP").

41.    The ADP process is designed to mitigate financial risks, avoid incompatibilities among systems, and ensure that a system supports the program goals and objectives and operates as intended by law and regulation, and to ensure that the expenditure of federal funds is made in accordance with federal regulations.

42.    To begin the process of seeking FFP for automated data processing services and equipment, a State must submit an Initial APD, which is a recorded plan of action to request funding approval for a project involving such services and/or equipment.

43.    Should a state need additional federal funding for subsequent years,  is the case when a state enters a multi-year contract with a vendor to build and update complex, multi-faceted IT systems, or  need additional funding to cover cost overruns in connection with federal APD funding procured through a prior year's APD, the state must submit either:

- an Advanced Planning Document update (APD), which is a document or record submitted annually (Annual APD) that provides a progress report on the status of all of the states' pending projects which are receiving federal funding and/or post implementation cost-savings; or,

- an As Needed APDU, which is the appropriate procedural vehicle to seek approval of FFP for an ongoing IT services project when significant project changes are anticipated; for incremental funding authority and project continuation when approval is being granted by phase; or, to provide detailed information on project and/or budget activities as specified in 45 C.F.R. § 95.610(c).

44.    Since at least 2010, the United States has approved FPP and paid out federal money to the Commonwealth, through PADHS, to fund up to ninety percent (90%) of the cost of Deloitte's invoices submitted to Commonwealth pursuant to *inter alia* the 16-09 Contract.

45.    Thus, the PADHS budget for Deloitte's IT services contracts, is comprised of up to 90% of federal funds.

46.    Defendants knew that their contracts with PADHS were subject to, governed by and administered according to specifications issued by PADHS and approved by the United States, as well as funded in whole or in part by the Federal Government.

47.    By inflating the base fixed price of Commonwealth contracts, and by submitting fraudulently inflated invoices for work covered under Deloitte's monthly fixed price billing, and for contract "add ons" invoiced on a time and materials basis, Deloitte knew, or acted in reckless disregard of the fact, that its actions would, as a direct, proximate and foreseeable result, cause the Commonwealth through PADHS to submit false requests for FFP upon which the United States would rely, and has relied, to its financial detriment.

13

48.     Notably, the APD process described above is not the only source of federal funding sought and received by the Commonwealth to subsidize Deloitte's IT services contracts.

49.     The Commonwealth also receives federal funding pursuant to various grants and other federal benefits programs.

50.     Thus, as a threshold matter, the Commonwealth itemizes each applicable federal funding source, and the corresponding amount of federal funding received, in the APD.   In turn, the Commonwealth details in its APDs the total amount of its projected IT services costs for the upcoming fiscal year.  The Commonwealth bases its projected IT costs upon the financial terms of its contracts to third party IT consultants, including Deloitte.

51.     Then, by and through the APD, the Commonwealth requests funding of up to ninety percent (90%) of the shortfall between its federal funding commitments and the Commonwealth's projected IT costs for the upcoming fiscal year.

52.     The amount of the Commonwealth's request for FPP through the APD process for IT services is directly affected by the work orders, work plans and cost sheets submitted by third party consultants, including Deloitte.

53.     In turn, the United States relies upon the truth and accuracy of the Commonwealth's projected costs under its contracts with third-party consultants, including Deloitte.

54.     Deloitte's fraudulent scheme has caused the Commonwealth to submit inflated costs in APDs both in seeking prospective federal funding as well as in seeking reconciliation for cost overruns incurred by the Commonwealth in previous fiscal years.  For example, the Commonwealth has submitted APDU documents in connection with the Lots 6 and 7 contracts awarded to Deliotte in connection with RFP #16-09.

**A.     PADHS Secures FFP to Fund Deloitte's Lot 6 and 7 Contracts.**

14

55.     In 2006, PADHS submitted an Initial As Needed APD to USDHHS requesting approval of FPP for information systems operations and maintenance for the October 2006 through June 2009 timeframe.  Not surprisingly, the vendor costs for which PADHS sought FFP in the 2006 APD included the cost of funding Deloitte invoices submitted pursuant to Contracts 16-05 and 39-06.

56.     As Relators allege *supra*, RFP #16-09 Lots 6 and 7 were essentially rebids of pending or recently expired Deloitte contracts that Deloitte had worked under for approximately four (4) years.  Based on the rampant fraud perpetrated by Deloitte in connection with the 16-09 Contract, Relators believe and therefore allege Deloitte perpetrated the same fraudulent billing scheme in connection with  the substantively similar 16-05 and 39-06 Contracts.

57.     PADHS submitted a series of APDUs in the ensuing years to cover the cost of its ongoing, multi-year IT services contracts with third-party vendors including Deloitte.

58.     Relevant to Contract 16-09, PADHS submitted an As-Needed APDU to USDHHS on August 12, 2012.   The August 2012 APDU sought funding for the Commonwealth's projected costs for the vendors selected for the 16-09 contract, including Deloitte, which was awarded the bulk of the work, during the upcoming fiscal year ending June 30, 2013.

59.     In furtherance of securing FFP for 16-09 Contract costs, PADHS appended copies of the 16-09 Lot Contracts, including Deloitte's 16-09 contract, to the APDU for USDHHS's "final review and approval."

60.     In approving PADHS's request for FFP as set forth in the APDU for the Deloitte contract, USDHHS relied upon the truth and accuracy of the terms, conditions and limitations set forth in those contracts.

61. Within approximately one month of the Commonwealth's APDU submission, and within just five months of the execution of the 16-09 contract, PADHS and Deloitte entered into the first of three contract amendments which ultimately increased the fixed price of the contract by nearly $2 million.

62. PADHS submitted another APDU to USDHHS on June 25, 2013. PADHS's APDU included a detailed progress report on all pending federally-funded IT projects, including the progress of the 16-09 Contract, and requested FFP for the cost of those projects/contracts, including the projected costs of Deloitte's work, for July 1, 2013 through June 30, 2014.

63. PADHS submitted another Annual APD Update in April 2014, which provided an updated progress report on the status of the ongoing projects undertaken in Fiscal Year 2012, i.e., the 16-09 Contracts, and requested FFP for 16-09 contract project costs to be incurred during the next fiscal year, i.e., July 1, 2014 through June 30, 2014.

64. Upon information and belief, PADHS also submitted Annual APDUs on or about April 2015 and April 2016.

65. In accordance with the terms of RFP #16-09, PADHS relied upon the truth, accuracy and legitimacy of Deloitte's Proposals bid documents, work orders, works plans and costing sheets, among other material documents, in preparing its progress report and in calculating the amount of FFP that it requested to subsidize the majority of Deloitte's fees for Lots 6 and 7 IT work in each annual APDU submission.

66. Deloitte's fraudulent schemes caused the Commonwealth to submit falsified APDUs in that they materially misrepresented the progress of Deloitte's work on Lots 6 and 7, and miscast necessity and legitimacy for increased federal funding to cover Deloitte's extraordinary cost overruns.

67. The United States, through USDHHS, approved each of PADHS's requests for FFP to fund *inter alia* the cost of Deloitte's fixed price and M&E work on Lots 6 and 7 based upon the

16

Commonwealth's unwittingly falsified APDUs.

68. The United States' decisions to provide FFP to fund the Commonwealth's costs for *inter alia* Deloitte's IT services from 2012 through the present in the annual amounts requested by the Commonwealth were made in reliance upon the truth and accuracy of the information set forth in the APDU.

69. The United States would not have approved FFP to fund Deloitte's ostensible "work" and invoices had the United States known of Deloitte's fraudulent billing scheme.

70. Deloitte's procurement of the 16-09 Contract for Lots 6 and 7 based on a knowingly false and fraudulent Proposal as is discussed *infra* rendered each and every claim for payment made by Deloitte under that contract a false claim as defined by the FCA.

71. Moreover, Deloitte's false and fraudulent Work Orders, Work Plans, Costing Sheets and invoices, which resulted in inflated payments made by the Commonwealth to Deloitte out of federal funds independently constitute false claims, statements and/or records as defined by the FCA

## VII. ALLEGATIONS

### A. The Commonwealth Ostensibly Seeks to Reduce Deloitte's Role in Connection with RFP #16-09 Procurements.

72. The Department of General Services (hereafter "DGS") issued RFP #16-09 on or about June 21, 2010. The purpose of RFP #16-09 was to procure professional information technology (IT) support and services to: 1) assist PADHS business organizations in defining their IT service needs; and, 2) provide application maintenance and operational support services with enhancements, to support DPW's (now PADHS) strategic business systems while concurrently providing assistance in promoting and expanding DPW's service adoption strategy.

73. RFP #16-09 expressly advised bidders that the contracts to be awarded "will be funded, in whole or in part, with federal monies."

74.     PADHS unveiled its revamped, multi-vendor procurement strategy in RFP #16-09, the purpose of which was to "… encourage competition and lessen [PA]DHS's reliance on a single vendor."

75.     Deloitte undoubtedly was the "single vendor" upon which PADHS had come to overly rely.

76.     Pursuant to the multi-vendor procurement strategy, the requested services were partitioned into "…three (3) service types – business IT consulting, systems architecture design, and technical services - and then further divid[ed] the business IT consulting services into separate bodies of work, Lots 1-5…," and finally divided the IT technical services into two separate bodies of work, Lots 6 and 7.

77.     Further, the terms of the RFP directed that in no event would Lots 1-5 be awarded to the same vendor as Lot 7.  Lot 6, on the other hand, could be awarded independently or in conjunction with any other Lot(s).

78.     Lots 6 and 7 were individually more financially lucrative than the remaining Lot 1-5 contracts combined.  Indeed, the Lots 6 and 7 combined contracts accounted for over 80% of the total value for all 7 Lot contracts for the five-year base term.

79.     In turn, coincidentally – or more likely not – Deloitte was the incumbent bidder for the precise work within the scope of Lots 6 and 7.

80.     Moreover, Deloitte had the Commonwealth's total trust, faith and reliance, which Deloitte had elicited over the course of their nearly four-decade long business relationship which generated hundreds of millions of dollars in revenues for Deloitte.   Unbeknownst to the Commonwealth, Deloitte exploited this misplaced trust, faith and reliance for financial gain.

18

81.     The Commonwealth awarded the Lots 6 and 7 contracts to Deloitte over competing proposals.   Under the extenuating circumstances, the award of the Lot 6 and 7 Contracts to Deloitte was, in essence, a fait accompli before the bidding commenced.

82.     The Lot 6 and 7 contracts, individually and collectively, were the largest in terms of dollar value by a large margin.   According to the Commonwealth's 2014 APDU, the total combined value of the Lots 1-7 contracts was $362,121,571.17…" of which 80%, or $298,502,989.66, was allocated to the Deloitte contracts.   By comparison, the next largest fixed base contract price totaled just $25 million, which is less than *half* the base contract price of the smaller of the two contracts awarded to Deloitte.

83.     Consequently, the Commonwealth's multi-vendor approach was unsuccessful in eroding Deloitte's dominance and entrenchment with respect to Commonwealth IT consulting services, thus providing Deloitte with yet another ripe opportunity to defraud the United States of hundreds of millions of dollars.

**B. Deloitte Falsely Certified the Labor Cost Detail Supplied in its Proposal to Be True and Accurate.**

84.     As is alleged *supra*, the financial terms of Deloitte's Lot 6 and 7 contract were comprised of fixed monthly payments in addition to hourly payments for M&E work.

85.     RFP #16-09 required Offerors to submit Proposals containing an abundance of detailed information, data and analysis to substantiate the amount of each vendor's fixed price and M&E price proposals.

86.     More specifically, each Proposal was required to contain:

A)      the total labor hours necessary to complete the scope of the services required in the Lot as well as the time required to complete multiple discrete tasks;

B)      a staffing chart disclosing all of the names, job title and function of each employee

19

the Vendor chose to staff for the project and a description table identifying the role, duties and function of each staff member, their individual educational backgrounds and their qualifications and experience in providing IT services;

C)    a firm, fixed, blended hourly rate at which the Offeror would bill all contract modifications and enhancements work; and,

D)    a comprehensive list of the Offeror's direct costs for all travel, subsistence, equipment and other expenses to be incurred performing under the contract.[5]

87.    Presumably to guard against bidding fraud, RFP # 16-09 expressly required the Offeror to certify the accuracy of the information submitted in its Proposal documents::

> each Offeror understands, represents, and acknowledges that... [a]ll of the Offeror's information and representations in the proposal are material and important, and the Issuing Office may rely upon the contents of the proposal in awarding the contract(s). The Commonwealth shall treat any misstatement, omission or misrepresentation as fraudulent concealment of the true facts relating to the Proposal submission, punishable pursuant to 18 Pa.C.S. § 4904.

88.    Possibly due to Deloitte's huge cost overruns expended on M&E work in prior contracts, the RFP design anticipated that a certain amount of M&E work would be necessary during the performance of the Lot 6 and 7 contracts. In an apparent effort to control the cost of M&E work, which is billed at hourly rates above and beyond the contract fixed price, the RFP delineated annual budgets for M&E work for each base year of the contract. For example, for Lot 7, the RFP budgeted 320,000 hours as the maximum number of M&E hours available to the winning bidder during Contract Year 1.

89.    For Lot 6, the RFP budgeted 80,000 hours for M&E work in connection with Lots 6 and 7 during Year 1 of the contract, stating: "[i]t is the Department's expectation that all

---

[5] The RFP directed vendors to provide actual costs in their proposals, and instructed that any bid/proposal which estimated or assumed regarding project cost would eligible to be summarily rejected at the discretion of the Commonwealth. Further, the individual costs such as travel, subsistence, equipment and other expenses were to be delineated in line item format, to increase transparency.

Modification/Enhancement tasks and requirements shall be accomplished under the terms of the contract for work authorizations and approvals, cost methodology, billing/invoicing, staff time, payments, documentation support and any other applicable standards, procedures and contract specifications."

90.     A template Cost Submittal work sheet was appended as Appendix L to RFP #16-09.  Each Offeror, including Deloitte, was required to complete and append to its the template Cost Submittal Sheet and to provide "a fully loaded, hourly blended rate" at which the Offeror proposed to bill all M&E work for each Lot.[6]

91.     Each Offeror was required to describe their ability to estimate accurately large and small changes in the scope of work, to manage their work to meet the estimated schedule and cost; and their ability to respond to unforeseen resource needs throughout the contract.

92.     The number of M&E hours budgeted annually varied greatly by Lot.  For certain Lots, there were no M&E budget allowances.

93.     Of note, the terms of the RFP and the resulting contracts prohibited the vendors from billing M&E work in Contract Year 1 until after the 6-month no-cost Orientation/training period.  Hence, the 400,000 budgeted to Lots 6 and 7 was extremely robust for a six (6) month period.

94.     Despite PADHS's express limits placed on M&E work, Deloitte and PADHS amended the contract twice to enlarge the M&E budgets by a large margin.

**C.      Deloitte's Lot 6 and 7 Proposal and Resulting Contract.**

95.     Deloitte submitted its Proposal in or around August 2010.

---

[6] Modifications were defined to include: "Implementation of new or changed functionality required to support programmatic or policy changes and/or new state or federal statutes or regulations.  Enhancements to support desired operational improvements and efficiencies.  At the Commonwealth's discretion, major in-scope upgrades and/or replacement of one or more components as a result of the Commonwealth/DPW MITA or EA-SOA vision"

21

96.     PADHS received a total seventeen (17) bids/proposals in response to RFP # 16-09, each of which was ostensibly reviewed and evaluated by a PADHS-selected committee of "qualified personnel" tasked with selecting the winning Offeror for each Lot.

97.     Computer Aid, the losing bidder for Lot 7 contract, mounted a bid protest to the award of the contract to Deloitte. Computer Aid's bid protest highlighted what it alleged to be a material flaw in Deloitte's computation of its bid price and a subsequent adjustment thereto which by appearance rendered Deloitte the low bidder. Specifically, the RFP required all Offerors to include in its proposal price costs associated with the initial six month "orientation" period of the contract, which was to be performed at no-cost to the Commonwealth. The inclusion of such costs for the purposes of the Proposal only significantly advantaged Deloitte and disadvantaged all non-incumbent bidders, since, as Computer Aid alleged, Deloitte's labor hours and expenses would necessarily be far lower as the incumbent with the facilities, trained personnel and equipment already in place. Computer Aid maintained that it outbid Deloitte when accounting only for the contract price PADHS would pay.

98.     Unable to prove that the award of Lot 7 to Deloitte constituted an abuse of discretion standard applied in such cases, Computer Aid lost its bid protest. However, Computer Aid's objections proved to be prescient.

99.     Thereafter, PADHS and Deloitte executed the Lot 6 and 7 contract, and on or about April 16, 2012, Deloitte commenced work on the Lot 6 and 7 Contracts.

100.    Notably, the contract expressly incorporated by reference the terms of RFP #16-09 and Deloitte's Proposal. Those documents were appended to the contract as well.

101.    Importantly, Deloitte covenanted as follows in the contract:

Contractor covenants that the representations made to [PADHS] in its Proposal are true and correct. Contractor further covenants that to the best of its knowledge and belief all

22

of the information submitted to the department in or with its Proposal is accurate and complete in all material respects.   Such representations are continuing ones and Contractor will notify the department within ten (10) business days of any material fact, event or condition which arises or is discovered, which affects the representations make (sic) in or in relation to its Proposal.

102.   As stated above, the first six months of the contract was designated as the no cost Orientation period, and in month 7, i.e., November 2012, PADHS would begin to make monthly fixed price payments to Deloitte: $216,290 for Lot 6 work and another monthly fee of $1,768,454.25 for Lot 7 work.  Thus, Deloitte's monthly fixed fee totaled $1,984,744.75 for Lot 6 and 7 work.

103.   The contract was replete with references to the calculation of Deloitte's monthly fixed price fee.  According to the contract, the agreed upon fixed base contract price for Year 1 would be divided by 6, to account for the fact that Deloitte would receive 6 payments during Contract Year 1.

104.   As Computer Aid's bid protest suggested, Deloitte completed the no-cost orientation period a month early - in September 2012.  However, the contract did not permit Deloitte to commence the Operational Phase of the contract, nor did it authorize PADHS to commence monthly payments for such work prior to November 2012.  Thus, the parties executed the first of three contract amendments ("Amendment 1") the terms of which were to Deloitte's decided financial advantage and ultimately greatly increased the base fixed price of the lots 6 and 7 contracts.  By the terms of Amendment 1, Deloitte was authorized to commence the Operational Phase of the Contract, and was entitled to receive its fixed monthly installment payment, beginning on October 1, 2012.

105.   Similarly, in connection with the commencement of the Operational phase of the contract, Amendment 1 authorized M&E work and invoicing to begin concomitantly.

106.     Notably, the contract required Deloitte to submit an invoice on a monthly basis as a condition precedent to PADHS's payment of Deloitte's fixed monthly payments

107.     Similarly, as a condition precedent to PADHS's payment for M&E deliverables, Deloitte was required to prepare and submit for approval a Work Order containing pricing estimates among other things requested by the Commonwealth, and then upon completion of the work, to submit an invoice demanding payment in a specific amount, at hourly rates.

108.     Each work order, once approved, incorporated the Contract's Terms and Conditions.

109.     Whereas Deloitte's Work Orders identify the total cost of the project proposed, i.e., the labor cost (hours times hourly rate), plus costs, the Work Plan, by the terms of the RFP and ultimately the contract, required far more detail.  By the terms of the RFP, and thus the governing contract, a Work Plan would  describe in detail:  the scope of the work to be performed; the purpose the end product was to serve within the larger scope of the project; the estimated start and completion dates; the name and position of the Deloitte employees that were to staff the project; the number of hours each staff member would work on the project; the applicable hourly rate; and it would delineate each of Deloitte's assumptions with regards to each party's responsibilities to support the work called for in the proposed project.

110.     These details were, and continue to be, material to the Commonwealth's ability to properly and fully evaluate the propriety and necessity of Deloitte's M&E proposal.

111.     The costing sheet delineates hard costs, such as costs for software, equipment etc.

112.     Upon the completion of a deliverable described in a Work Plan pursuant to an approved Work Order, the contract required Deloitte to submit a final, updated work order and invoice for the fully completed M&E work identifying the final cost of the work

113.    Deloitte's Work Plans and Work Orders are created during the nascent phase of a project, *i.e.*, before the full scope and nature of the project and the effort necessary to complete the project are well defined.  Thus, a reasonable variance between the estimate documents and the final invoice is not only reasonable, but to be expected.

114.    However, Deloitte's M&E Work Plans, Work Orders and Costing Sheets precisely match Deloitte's M&E estimates set forth in Work Plans, Work Orders and Costing Sheets almost without exception.  Relators aver and allege that such routine, pinpoint accuracy in the estimation process is impossible, absent fraud.

### D.    Deloitte Unlawfully Submits False, Inflated Claims for Payment for Fixed Price and M&E Work.

115.    As is alleged *supra*, just a few short months after Deloitte commenced the Operational phase of the Lot 6 and 7 contract, Deloitte and PADHS entered into the first of three (3) amendments thereto that shortened the no-cost orientation period and hastened payments made by PADHS to Deloitte.

116.    As a threshold matter, amending the contract so close in time to its execution to so materially change the payment terms is highly suggestive of bidding fraud.

117.    Moreover, major revisions were made to the contract terms via the amendment when by the very nature of the amendment, very little contract language needed modification.

118.    The amendment promptly and adequately hastened the Operational Phase of the contract and authorized the Commonwealth to commence payments of Deloitte's monthly fixed price fee and for M&E work, yet the amount of the fixed monthly payments to Deloitte were left unchanged.

119.    Accordingly, although Deloitte received seven (7) monthly installment payments, Deloitte apparently invoiced PADHS, and received payment from federal funds for 1/6 of the agreed upon Year 1 fixed based contract price, yet Deloitte received 7 monthly payments in that Contract year.  Thus, Deloitte

inflated its reimbursements under the supposedly fixed contract price by $2 million in the very first year of the contract.

120.     Nowhere in Amendment 1 did the parties agree to enlarge the fixed base of the contract, nor should the Commonwealth have so agreed.  By the very nature of fixed price contracts, the risk is put upon the bidder if more work is required or performed than that which formed the basis of the amount of the winning bidder's proposal.  Nor would PADHS be authorized to unilaterally increase the base fixed price of the contract, particularly in this material amount.

121.     Relators aver that Deloitte invoiced and pocketed the $2 million overpayment purposefully and knowingly.

122.     To Relators' knowledge, Deloitte has not refunded or otherwise reconciled this overbilling.  To the contrary, Deloitte had moved on to inflating reimbursements for bogus M&E work, among other things.

123.     Approximately nine (9) months after the execution of Amendment 1, PADHS and Deloitte amended the contract again.  (Amendment #2)

124.     The thrust of Amendment # 2 was to increase the maximum number of billable M&E

hours in Years 2 and 3 by an alarmingly large margin[7]:

| CONTRACT YEAR | ORIGINAL CONTRACT Lot 6 MAXIMUM M&E HOURS | ORIGINAL CONTRACT Lot 7 MAXIMUM M&E HOURS | ORIGINAL CONTRACT Lots 6 and 7 Combined | AMENDMENT 2 M&E HOURS Lots 6 & 7 Combined |
|---|---|---|---|---|
| YEAR 2 | 80,000 | 320,000 | 400,000 | 993,427 |
| YEAR 3 | 80,000 | 320,000 | 400,000 | 557,573 |
| YEAR 4 | 80,000 | 320,000 | 400,000 | 400,000 |
| YEAR 5 | 80,000 | 320,000 | 400,000 | 400,000 |

125.     As a result of the substantial increases to the M&E budgets bestowed by this amendment,

the maximum contract value of the DL Contract skyrocketed from $298,502,989.66 to $369,679,706.

126.     This amendment effected a substantial financial detriment of the United States.  Deloitte

willfully perpetrated a pervasive fraud on the US through PADHS in connection with unnecessary and

otherwise bogus M&E work in order to exhaust the annual M&E budget to the penny.

127.     On or about May 21, 2014, PADHS and Deloitte amended the Contract for a third time in

less than two years ("Amendment 3").

128.     The purpose of the amendment as stated therein was to "…increase the number of hours

---

[7] Beginning in Amendment #2, the parties combined the Lots 6 and 7 M&E budgets.  Previously the parties broke out the individual amounts, which is the more appropriate approach to maintain the integrity of the separate and independent contracts.  Relators believe and aver that combining the M&E hours served Deloitte's fraudulent interests by allowing Deloitte to allocate the total M&E budget as it saw fit and where it was needed to maximize reimbursements.  By way of example, to the extent the Lot 6 M&E budget had been exhausted but a need arose for M&E work under Lot 6, by combining the M&E budgets funding was available to Deloitte for such work, whereas by maintaining the budgets separately, Deliotte would likely forfeit those additional billable hours.

dedicated to the Contract for modifications of in-scope systems and otherwise modify the Contract's payment provisions to allow [PADHS] to complete other [PPACA]-related projects, make further upgrades and improvements to [PADHS's] Child Welfare Systems, and make other modifications and enhancements necessary to improve [PADHS] Operations and provide for more efficient and effective service delivery;…"

129.   Specifically, the M&E budget for Year 3 was once again increased, as well as the M&E budgets for Years 4 and 5, as follows:

| CONTRACT YEAR | ORIGINAL CONTRACT<br><br>MAXIMUM M&E HOURS | AMENDMENT 2<br><br>MAXIMUM M&E HOURS | AMENDMENT 3<br><br>ESTIMATED M&E HOURS |
|---|---|---|---|
| YEAR 2 | 400,000 | 993,427 | 993,427 |
| YEAR 3 | 400,000 | 557,573 | 991,384 |
| YEAR 4 | 400,000 | 400,000 | 541,695 |
| YEAR 5 | 400,000 | 400,000 | 418,109 |

130.   Of particular import to the parties' state of mind with regard to potential additional amendments and expansion of the M&E budgets, the parties conspicuously re-characterized the annual M&E budgets in Amendment 3 as "estimates" subject to expansion:

The number of annual contract hours dedicated to systems Modifications and Enhancements are estimated. If [PADHS] identifies a need to increase the estimated number of annual hours dedicated to Modifications and Enhancements to perform services and compensate [Deloitte] for such services rendered pursuant to this Contract, [PADHS] may issue Change Orders in Accordance with [the Final Contract Terms and Conditions, as amended herein].

131.   In contrast, previously the contract had always referred to "maximum M&E" annual budgets and stated PADHS's expectation that Deloitte comply with the M&E budgeted hours..

132.    The parties also struck in its entirety Section 20(a), Final Contract Terms and Conditions, with drastically different terms that for the first time authorized the Commonwealth to request contract changes to increase the annual M&E budget to cover any shortfall between the "estimated" M&E hours set forth in Amendment 3 and Deloitte's "actual hours necessary to perform necessary services."

133.    Following the execution of Amendment 3, the Contract price ballooned another $59.5 million, to a total of $429,236,013.20.

134.    Thereafter, the parties exercised the Amendment 3 revised Section 20(a) language which allowed PADHS to increase the annual M&E budget yet again via a Contract Change Order as follows

| CONTRACT YEAR | ORIGINAL CONTRACT  MAXIMUM M&E HOURS | AMENDMENT 2  MAXIMUM M&E HOURS | AMENDMENT 3  ESTIMATED M&E HOURS | CHANGE ORDER 1  ESTIMATED M&E HOURS |
|---|---|---|---|---|
| YEAR 2 | 400,000 | 993,427 | 993,427 | 993,427 |
| YEAR 3 | 400,000 | 557,573 | 991,384 | 1,134,946 |
| YEAR 4 | 400,000 | 400,000 | 541,695 | 718,743 |
| YEAR 5 | 400,000 | 400,000 | 418,109 | 418,109 |

135.    In addition to the increase in M&E hours totaling $32,441,500.08, Change Order #1 effected an increase of $12,022,377.93 in Deloitte's Year 4 flat fixed payments, or $472,471 per month.

136.    The execution of Change Order #1 on or about November 25, 2014 increased the total contract value of the Lots 6 and 7 Contract to $473,675,209.03.

137.    As is alleged *infra* and *supra,* Deloitte perpetrated a pervasive fraud on the US through PADHS in connection with unnecessary and otherwise bogus M&E work calculated to exhaust the

entirety of each annual M&E budget down to the penny.

138.    As stated above, Deloitte billed the Commonwealth on an hourly basis for M&E work, plus materials. Deloitte's hourly rate was set forth in its Proposal and ultimately the Contract, though the hourly rate was adjusted as the M&E budgets were expanded via contract amendment.

139.    Despite the safeguards provided in the RFP and the contract with respect to setting maximum M&E hours, Deloitte managed, as it routinely does, to renegotiate those terms so as to drastically increase its receipts under the Commonwealth contract. Relators believe and aver that Deloitte achieves this same result in contract after contract by exploiting PADHS's misplaced trust and reliance upon it.

140.    Based on the foregoing, since at least April 2012 and continuing through at least March 17, 2017 (when the base term of the Lot 6 and 7 Contract expires); or, alternatively March 17, 2020 (when the three contract option years expire), Deloitte has and will continue to submit false claims which inflate its M&E invoices by convincing PADHS to approve illegitimate and improper M&E deliverables, as is alleged.

**E.      Defendants' Fraudulent Invoices Seeking Inflated Reimbursements Constitute False Claims.**

*1.      Deloitte's Falsification of Work Orders, Work Plans, Costing Sheets, Invoices, among Other Documents In Furtherance of its Scheme to Inflate Fixed Price and Hourly Reimbursements*

141.    PADHS's contracts with Deloitte, including the Lots 6 and 7 Contract, established a common sense process for planning, tracking and invoicing for all work initiatives, as is alleged generally *supra*.

142.    Pursuant to the RFP, the terms of which were expressly incorporated into the Contract, Deloitte was required to track the hours expended by individual employees working on

project tasks and to "[p]rovide a monthly report that shows the expended time by each person for each work order."

143.     The Contract further required Deloitte to submit a final invoice to PADHS following PADHS's receipt of M&E deliverables certified by Deloitte to be complete "....that track(s) the actual time spent by individual employees in performing contract tasks for [PADHS]."

144.     The 16-09 Contract provides in pertinent part: . . ." the contractor must submit an invoice, a copy of the written acceptance of the deliverable and any required documentation to the DHS Contract Administrator.  For each deliverable invoiced, the Contractor will provide documentation, minimally disclosing the job position title and name of the individual(s) who performed the work for the invoiced amount, and actual hours worked and rate per hour and other documentation that will allow the reviewing officer to draw sufficient conclusion on acceptability of the invoice.  Upon acceptance of the Contractor's invoice and confirmation of work performed, the Commonwealth will make payment according to the terms of the contract."

145.     In Relators' vast experience with Deloitte's document submissions for M&E work from the initial proposal up through the invoice, Deloitte routinely ignored its contractually-mandated substantive obligations with regards to the preparation of Work Orders, Work Plans, Cost Sheets and Invoices.

146.     Relators' detailed analysis of Deloitte's Work Plans, Work Orders, Costing Sheets and invoices corroborates, that most commonly, Deloitte's documentation was consistently and materially devoid of the material information Deloitte agreed to provide in the contract.  On the other hand, their review revealed that in some instances, though not with great frequency, Deloitte provided the detailed information required in the contract.

31

147.    With regard to those invoices, work orders and work plans, etc. for which Deloitte provided the required information, Relators have evidence and information that Deloitte's information is materially inflated and/or fabricated, as detailed *infra*.

148.    By way of comparison, the other three Lot vendors entered into contracts substantively similar to that of Deloitte, and in turn which required these vendors to disclose the same information in their work plans, work orders, and invoices, *i.e.*, staff names and hours worked, along with each such employee's job position and title.

149.    Relators have information, and therefore aver, that the other three 16-09 vendors fully complied with their contractual obligations to provide itemized estimate documents in connection with invoices they submitted to PADHS for payment.

### 2.    *Relators Confirm Defendants' Overbilling Scheme*

150.    Relators have individually observed Deloitte staff working in the field on Lots 6 and 7 contract tasks and/or M&Es thereto.  Relators have also reviewed and analyzed Deloitte's Lot 6 and 7 deliverables.

151.    Moreover, Relator FXH attended numerous meetings during which Deloitte proposed M&E projects, and pitched their importance, necessity, and time sensitivity in PowerPoint slides to secure PADHS's approval of same.  To an individual with advanced IT knowledge and expertise such as Relator, Deloitte's pitches oftentimes seemed calculated to exploit PADHS's relative lack of knowledge and understanding of complex IT matters in order to secure approval of unnecessary, inflated or otherwise fraudulent M&E work.  However, due to PADHS's misplaced trust and reliance upon the integrity of Deloitte's work, PADHS approval was granted.

152.    In one such meeting, which took place on or about the week of May 5, 2016, Deloitte's presentation pitched unnecessary M&E work that not coincidentally exhausted the Commonwealth's 16-

09 M&E budget for the Quarter, down to the penny.

153.     Moreover, Deloitte's pitch seemed carefully timed so that Deloitte could complete the project and in turn the project cost could be invoiced to the Commonwealth prior to the Quarter's end.

154.     Based on their observations, communications with colleagues and documentation available to them in their respective roles as IT services project managers, Relators became concerned about the integrity and legality of Deloitte's billing practices.

155.     Relators' concerns spurred them to undertake an exhaustive review and analysis of Deloitte's core invoicing documents, i.e., the documents which form the basis for Deloitte's payment requests submitted to PADHS from 2012 through the present.

156.     The core documents Relators reviewed included Deloitte Work Orders, Work Plans and Costing Sheets, among other documents.

157.     Relators' analysis verified with a high degree of certainty that Deloitte materially inflated and/or fabricated its labor costs for fixed price and M&E work for which it sought payment.   Among the most condemning of Relators' findings is the frequency with which, and the amount by which, Deloitte routinely inflated billable labor hours.

158.     Moreover, in those instances where Deloitte complied with the 16-09 Contract requirements to disclose detailed information about labor hours and the employees for which those hours were billed, Defendants not only purposely inflated labor hours, but falsely attributed those hours to Deloitte employees who had not performed the work, to give its documentation the veneer of legitimacy. Some of the employees to whom Deloitte attributed work had not even worked on the 16-09 Contract at the time identified on the invoice, if ever.

159.     Deloitte engaged in this unlawful scheme with the purpose and intent to secure payments, which it had not earned and which were not legitimately owed.

160.    Specific examples of this conduct derived from Relators' analysis of Deloitte's Work Orders are set forth in detail *infra*.

161.    Relators also undertook a detailed analysis of Deloitte's Work Orders, employee rosters, and its Appointment and Termination Letters to analyze the "supply" of Deloitte employees available to work on 16-09 Contract projects (derived from an employee roster provided to PADHS by Deloitte and subsequent Appointment[8] and Termination Letters) compared to the demand for 16-09 contract work (based on Deloitte's records of employee billable hours submitted to PADHS in invoices, work order costing sheets, work plans and correspondence seeking payment for those hours) during the October 1, 2012 through March 1, 2015 time frame.

162.    Relators' analysis demonstrates that the 16-09 project demand as stated in Deloitte's records often *exceeded* Deloitte's supply of available employees to perform this work.

163.    Needless to say, absent fraud, the demand as determined by Deloitte's invoices could not exceed available employee supply, particularly given the frequency and the extent of the excess revealed in Relators' analysis.

164.    Relators' Supply vs. Demand analysis, which is based on a sampling of Deloitte's estimation documents,  conservatively identified overbillings Deloitte submitted to PADHS for payment, and which were paid by PADHS with federal funding,  in excess of $22 million, during times that Deloitte lacked an adequate supply of available personnel to perform such work.

3.      *Deloitte's Additional M&E Billing Schemes*

165.    Relators' analysis of Deloitte documents as discussed *supra* also demonstrate that Deloitte routinely inflates labor hours in Work Orders submitted for M&E work, as well as engaging in numerous

---

[8]An "appointed" resource is a Deliotte employee identified as available to work on the 16-09 contract and who has passed the requisite criminal background check by the Pennsylvania State Police.

other schemes to boost profits at the expense of the federal government.

166.    The amount PADHS ultimately pays Deloitte over the life of the contract is, in the end, far greater than the base contract amount of Deloitte's fixed price contracts with the Commonwealth after accounting for Deloitte's M&E invoices.   Thus, Deloitte's "low bid" amounts to nothing more than a fraudulent means by which it can attain the company's fraudulent end game, *i.e.*, defined and limited Maintenance work automatically paid on a monthly basis at a fixed rate combined with the opportunity for virtually unlimited work reimbursed at a generous hourly rate over a sustained period of time.

167.    For example, as is alleged *supra*, PADHS paid Deloitte over $530 million through June 2015 pursuant to the Lot 6 and 7 contracts.  In startling contrast, the combined amount of Deloitte's bid that induced the Commonwealth to award the 16-09 contract to Deloitte, and the resulting base fixed price of the Lot 6 and 7 contracts combined totaled just $298,502,989.60.

168.    Deloitte's 16-09 contract billables have already doubled the initial base fixed price of the contract *before* accounting for the monthly fixed maintenance fees and M&E billable hours Deloitte will generate at the expense of the US Taxpayer during the final year (Year 5) of the 16-09 contract.

169.    These additional Maintenance and M&E billings will generate tens of millions of dollars of revenue for Deloitte.

170.    Indeed, as of April 17, 2016, in excess of 418,000 M&E hours are budgeted for Deloitte to exhaust.  Based on Relators' knowledge and information, including the knowledge and evidence of Deloitte's pattern of conduct in manufacturing M&E projects to exhaust the M&E budgets for each of the preceding four years of the 16-09 Contract, they aver Deloitte will secure approval for illegitimate M&E projects and bill for every available M&E hour in Year 5.

171.    Relators aver, based on their first-hand experiences and information accumulated in the course and scope of their project management services rendered to PADHS, that Deloitte employs many false and fraudulent tactics to secure Commonwealth approval of projects to exhaust each year's exorbitant M&E budget.  One such tactic involves reconstituting work that is legitimately recompensed by the Commonwealth fixed-price terms of the Maintenance contract and into recasting fixed price work as essential M&E.  Deloitte easily pulls off this billing charade because it knows from experience that the PADHS personnel in leadership/decision-making roles lack the technical knowledge and expertise to detect Deloitte's scheme.  Instead, PADHS automatically defers to Deloitte in approving all requested M&E work.

172.    For example, as is alleged *supra*, Relators have knowledge and believe that Deloitte secured approval of and submitted invoices seeking reimbursement for M&E work to remediate software failures, defects, errors and delays and interrupted service which Deloitte's own defective software design and implementation caused.  Accordingly, these hours were not properly billable as hourly modifications and enhancements work.  On the contrary, the contract requires Deloitte to correct such defects at no additional cost per the following contract language:

> By submitting Developed Materials, the Contractor represents that, to the best of its knowledge, it has performed the associated tasks in a manner that will, in concert with other tasks, meet the contract specifications and objectives.
>
> *              *              *
>
> If the Commonwealth accepts Developed Materials under this Contract, and the Commonwealth subsequently determines, pursuant to Section 48, that the Developed Materials do not thus conform, then the Contractor must repair the deficiency at no expense to the Commonwealth in accordance with Section 48.

*Id.*, Final Terms and Conditions, at Paragraph 16(g).

173.    Defendants' false claims, records and statements in this regard are indisputably material to false claims, because Labor Hours are a primary determinant of the total fixed base contract price.  In addition, the terms of RFP # 16-09 state that the Offeror certifies the accuracy

and truth of the information contained in the Proposal and as such the Labor Hours reported in Offeror's Proposals were material to PADHS and were relied upon by PADHS in selecting the winning vendor.

174. PADHS would not have awarded the contract to a dishonest contractor who intentionally sought to defraud the state and the United States, nor would USDHHS have approved PADHS's request for FFP for Deloitte's services had the true facts been known.

175. Indeed, in addition to the binding representations and warranties with respect to the truth and accuracy of the information set forth in its Proposal, the Lot 6 and 7 Consolidated Contract ("Consolidated Contract") between Deloitte and PADHS specifically provides in pertinent part:

> Contractor further covenants that to the best of its knowledge and belief all of the information submitted to the Department in or with its Proposal is accurate and complete in all material respects. Such representations are continuing ones and [Deloitte] will notify the department within ten (10) business days of any material fact, event or condition which arises or is discovered, which affects the representations make (sic) in or in relation to its Proposal.

Consolidated Contract, ¶ 6.

4.   *Specific Examples of Deloitte's Falsified Work Orders Which Fraudulently Inflate And/Or Otherwise Materially Misrepresent M&E Billable Hours.*

176. At all times relevant to this Original Complaint, Deloitte submitted invoices to PADHS demanding payment for enormous amounts of hours of M&E work, which PADHS paid primarily out of federal funds secured by the Commonwealth and earmarked for this purpose, which were false and fraudulent. Relators' analysis of Deloitte's estimate documents revealed that the total number of hours billed for individual staff members oftentimes exceeded the total number of hours within the period billed for, even when giving Deloitte the benefit of the assumption that Deloitte staff worked twenty-four (24) hours a day, seven (7) days a week

(which it did not do).  Based on the pervasiveness of their findings with respect to an extensive sampling of Deloitte invoices and related documents, Relator aver Deloitte employed its fraudulent overbilling tactics in most, if not all, of its invoices submitted to the Commonwealth.

177.    Deloitte's false claims, records and statements in this regard include Work Orders, Costing Sheets, Work Plans and Invoices for both fixed price and modifications and enhancements work.

178.    Work Orders are essentially estimates Deloitte is contractually obligated to provide to the Commonwealth during the initial planning phase of a proposed M&E project awaiting Commonwealth approval.  To this end, the Lots 6 and 7 contract provided in pertinent part:

> For all necessary systems Modifications and Enhancements …, [Deloitte] will prepare a Work Order.  When developing the pricing estimate for the Work Order, [Deloitte] shall use the blended rate for the appropriate Contract Year…Work Orders shall include the information described in by Attachment 1, Part IV, Lot # 6 & Lot #7. …. Each approved Work Order will be deemed to incorporate the terms and conditions set forth in this Contract.
>
> For all Modifications and Enhancements provided by [Deloitte], [PADHS] will make payment to [Deloitte] following the [PADHS] Contract Administrator's written acceptance of each deliverable required by the approved Work Order.

*Id.*, Rider 1 to Amendment # 1, Payment Provisions, Blended Rate Component – Modifications and Enhancements, ¶ 1 c.

179.    Deloitte's materially inflated and falsified billable hours in M&E Work Orders, for which Deloitte received and accepted payment, violated the terms of the Contract, as follows:

a. Payment will be made to [Deloitte] pursuant to the terms Section (sic) 14 of the Standard Contract Terms and Conditions, Attachment A, Appendix A of this Contract, as amended) and this Contract.
b. [Deloitte] is not entitled to any additional consideration, compensation, salary, wages or any type of remuneration for services rendered other than that provided for in the Contract.

    c.  [PADHS] will disapprove any amounts that are not in accordance with the terms
of this Contract and may adjust payments to [Deloitte] accordingly.

*Id.* at ¶ 2 a. – c. ; *see id.* ¶ 3, Invoicing (requiring Deloitte to provide any and all information

requested by PADHS to accompany Deloitte's invoices "for the purpose of verifying [Deloitte's]

performance.").

    180.    For example, Deloitte invoiced PADHS for a total of 936 hours ostensibly for

work performed during January 2014 by John Vandersell.  Mr. Vandersell would have needed to

work more than 30 hours per day to reach a total of 936 hours during the month of January 2014,

which is, of course, mathematically impossible.

    181.    Deloitte's knowingly false representations of Mr. Vandersell's billable hours in

June 2014 is neither isolated nor an anomaly.  Also in January 2014, Deloitte billed PADHS for

a total of 984 hours for work ostensibly performed by Cyril Isaac during that one month alone.

This number would equate to work days of over 31 hours or every single day in January, 2014

for Cyril Isaac, which is, of course, a mathematical impossibility.  Even if Mr. Isaac worked on

the PADHS project every single minute of every single day in January, 2014, he could not have

possibly worked 984 hours in a single month.

    182.    Deloitte billed PADHS for 160 hours for the week of February 2, 2014, also on

Work Order 5003 for Ashwin Gaddam.  For Ashwin Gaddam to have worked this number of

total hours he would have had to work 22.85 hours every single day for that entire week.  While

not mathematically impossible, this scenario is extremely unlikely.  Deloitte's invoices for

Ashwin Gaddam's hours worked were grossly overbilled in comparison to the hours he

realistically could work during this time frame.

    183.    There are additional examples of Deloitte's prolific overbilling scheme in Work

Order 5003.  This Work Order includes a line item charging for 687 hours of work ostensibly

performed by employee Kayla Wells during the week of July 14-21, 2013; 402 hours during the week of July 21-28, 2013, and 368 hours during the week of July 28-August 4, 2013. Deloitte continued to inflate Ms. Wells' work hours throughout the rest of 2013 in Work Order 5003. Therein, Deloitte provides weekly invoices for hourly M&E work ostensibly performed in August 2013 in the following amounts: 268 hours, 353 hours and 258 hours. Deloitte's September 2013 billing records for Ms. Wells include weeks where Deloitte claimed that Wells worked 569 hours and 539 hours in back-to-back weeks, which, of course, are mathematical impossibilities.

184.    In Work Order 5003 alone, Deloitte charged individual's work weeks in excess of 200 hours per week for the following employees among others:  Kayla Wells (see above), John Vandersell (see above), Cyril Isaac (see above), Vivek Kumar (e.g. Deloitte billed for Kumar performing 240 plus hours in a week four times in January/February 2014), and Lauren Hughes (e.g. Deloitte billed 240 hours for Hughes just for the week of June 8-15, 2014).

185.    Shifting the analysis from the mathematically impossible to the enormously improbable (22.85 hours per day for seven days), Work Order 5003 sets forth line items charging 160 hours *or more* in a single week for:  Ashwin Gaddam (discussed above) and Swarna Repaka (e.g. Deloitte billed 168 hours for Repaka just for the week of April 6-13, 2014).  Additionally, Deloitte billed 152 hours (over 21 hours per day) for Mohan Ramaswamy for the week of October 20-27, 2013.

186.    Relators' analysis of Deloitte time records underlying Work Order 5005 shows that Deloitte invoiced payment for individual work weeks in excess of 200 hours per week for the following employees for Work Order 5005, *inter alia*:  Lauren Hughes (three weeks of 240 plus hours billed by Deloitte in October 2013), Pavani Darsi (weeks of 212, 284 and 320 hours

billed by Deloitte for Darsi in October 2013), Michael Metzger (during the time period of July through September 2013, Deloitte billed seven weeks for Metzger at 200 hours or more per week in the following amount of hours per week for Metzger, 313, 386, 309, 237, 343, 256 and 208), Swarna Repaka (e.g. Deloitte billed for Repaka performing weeks of 212, 320 and 284 hours in consecutive weeks during October 2013), and Cherie Groff (e.g. Deloitte billed for Groff performing weeks of 216, 360 and 320 hours in consecutive weeks during October  2013).

187.   The same is true for Work Order 5006.   Relators' analysis of Deloitte time records underpinning Work Order 5006 shows that Deloitte invoiced the Commonwealth for individual work weeks that exceed 200 hours per week for, *inter alia*, the following employees: Mike Kravanis (weeks of 344 hours and 216 hours billed by Deloitte in 2013), John Vandersell (a week of 240 hours billed by Deloitte for Vandersell in 2013), Nagaraju Padavala (during 2013, Deloitte billed weeks of 208, 200, 200 and 264 hours for Padavala), Priyanka Thakre (e.g. Deloitte billed for Thakre performing weeks of 200, 200 and 232 hours during 2013), Ashwin Gaddam (e.g. Deloitte billed for Gaddam performing weeks of 200, 200 and 280 hours during 2013, as well as billing out Gaddam for 184 hours in two other weeks in 2013), and  SVR Reddy (sic) (e.g. Deloitte billed for Reddy performing weeks of 232, 240, 200 and 232 hours in consecutive weeks during 2013).

188.   These same core issues are identifiable in Work Order 5007, but Deloitte's invoiced labor hours in this work Order are even more flagrant and outrageous.   Relators' analysis of Deloitte time records which form the basis for Work Order 5007 reveal that Deloitte invoiced the Commonwealth for individual work weeks of more than 200 hours per week for, *inter alia*, the following Deloitte employees:   Kayla Wells (nine weeks of hours in excess of 250 hours billed during 2013-2014, including weeks of 384, 264, 664, 664, 656, 336, 584, 560 and

448 hours); Mo Karam (ten weeks of hours in excess of 200 hours billed during 2013-2014, including weeks of 352, 232, 208, 640, 640, 632, 352, 560, 544 and 472 hours), and Swarna Repaka (e.g. Deloitte billed for Repaka performing a week of 208 hours during 2013).

189. Relators' analysis of Work Order 5008 time records also showed excessive billings for several weeks in the range of 160-240 hours per week.

190. A review of Work Order 6041 time records revealed a different but equally outrageous pattern of overbilling and fraud in and around September 2013. During the four-week time period of September 8 through October 6, 2013, Deloitte invoiced the Commonwealth for several thousand hours of employee time which would be mathematically impossible for the identified employees to work.

191. Specifically, Deloitte billed the following work hours during September 2013 for the following employees: Eugene Kim (448 hours, 440 hours, 440 hours and 376 hours for a total of 1704 hours over four weeks); Radha Vakkalagadda (440 hours, 440 hours, 440 hours and 368 hours for a total of 1688 hours over four weeks); Imteyaz Nawaid (440 hours, 440 hours, 440 hours and 360 hours for a total of 1680 hours over four weeks); Dhir Kothari (480 hours, 584 hours, 576 hours and 456 hours for a total of 2096 hours over four weeks); Scott Beinhower (520 hours, 632 hours, 624 hours and 504 hours for a total of 2280 hours over four weeks); Cherie Groff (480 hours, 584 hours, 576 hours and 456 hours for a total of 2096 hours over four weeks); and Colin Reynolds (480 hours, 584 hours, 576 hours and 456 hours for a total of 2096 hours over four weeks).

192. A comparison of time sheets for different work orders indicate that Deloitte inflated billable hours reported on Work Orders by spreading hours ostensibly worked by the same employee during the same week across multiple Work Orders. When such employees'

hours worked during a single week as reported in multiple work orders are combined and tallied, the total number of hours Deloitte is invoicing for hours worked by individual employees during a single week routinely exceeds 200 hours. As alleged *supra*, it is mathematically impossible for an employee to work 200 hours in one week, hence, the hours reported on one – or more likely both – Work Orders have been falsified by Deloitte.

193.    For example, for the week of December 7, 2014, Deloitte invoiced labor hours ostensibly worked by Ashwin Gaddam in two separate invoices. The first invoice contains a line item for 168 hours and the second invoice contains a line item for 80 hours. In so doing, Deloitte invoiced the Commonwealth for a total of 248 hours for Ashwin Gaddam during the week of December 7, 2014, which is mathematically impossible.

194.    Based on the systemic flagrance with which Deloitte inflated labor hours invoiced to the Commonwealth in the Work Orders identified above, as well as costing sheets, work plans and invoices for M&E work ostensibly performed under the Lot 6 and 7 Contract, Relators allege by inference that Deloitte's Work Order invoices submitted to PADHS over the life of the 16-09 Contract likewise constitute false and fraudulent claims in that they materially and intentionally overstate the reimbursement due Deloitte by inflating the number of billable hours and by false attribution of the work to Deloitte employees who had not in fact performed the work.

195.    The blended hourly rate applicable to Deloitte M&E work was at all times relevant to the complaint approximately $100 per hour. Thus, if the PADHS budget for the various contract projects awarded to Deloitte consists of between 80-90% of federal funds, the federal government is overbilled and overpays $80-$90 *per hour* in each of the Work Orders identified above as a direct and proximate result of Deloitte's willful overbilling scheme..

196.    Relators also confirmed through their exhaustive analysis of Deloitte's Work Plans, Work Orders and Costing Sheets, among other things, that Deloitte's description of the nature, purpose and scope of the work it proposes to perform and the deliverable it is to produce is so vague so as to render it impossible for PADHS reviewing personnel to verify whether or not Deloitte has performed the work described therein, or delivered an acceptable product.

197.    Deloitte fails to provide the most basic information regarding the identity(ies) of the Deloitte employees assigned to perform the work. Instead, oftentimes, Deloitte attributes the work performed/to be performed to the Deloitte Application Team, as is the case for example in Work Orders 6024, 6035, 6050.

198.    Relators, based on their insider knowledge of Deloitte's contract dealings with PADHS, its performance of work thereunder, the prolific nature of Deloitte's fraud in connection with its Work Orders, Work Plans and Costing Sheets, allege that since 2006 at the latest, Deloitte has systematically submitted false and fraudulent invoices which overcharge PADHS for work Deloitte staff did not perform. Relators have direct and independent knowledge that Deloitte's conduct is unabated and ongoing as of the date this Original Complaint is filed.

199.    The 16-09 Contract is not the first, nor the last, fixed price contract Defendants entered into with Commonwealth agencies. For example, Deloitte was awarded contracts in connection with, *inter alia* the following RFPs:

- **RFP #16-05,** Application Support Services for DPW's Strategic Business Systems. Issued on 11/14/2005. Contract end date on 6/30/11.

- **RFP #39-06,** Application Maintenance and Operational Support Services for the PA Child Support Enforcement System. Issued on 1/8/2007. Contract end date on 6/30/2011.

200.    Deloitte has been selected for numerous other IT consulting services contracts to provide such services to various Commonwealth agencies, including as PennDOT, OA/OIT, PDE, PID and L&I.

44

See p. 8.2-11 of 168 Lot 7 response to 16-09

201.   Based on Relators' intimate knowledge of the egregious and pervasive nature of Deloitte's fraudulent billing and bidding practices in connection with the 16-09 Contract, they aver that a review of Work Orders, Work Plans, Costing Sheets and Proposals submitted in connection with securing, performing and invoicing contracts such as those awarded pursuant to RFP # 16-05 and 39-06 will reveal that Defendants perpetrated the same fraudulent billing schemes in connection therewith.

F.     **Deloitte's False Bidding Scheme**

202.   Superficially, it *seems* not only nonsensical, but also innocuous, for Deloitte to have inflated hours invoiced on Work Plans, Invoices and other documents for fixed-price work since inflated work hours would not seem to lead to increased receipts.

203.   In this case, the submission of false, inflated invoices, work orders, etc., was an integral part of Deloitte's scheme to inflate the base fixed price of IT services contracts with the Commonwealth.

204.   Specifically, Deloitte's Proposals which induced the Commonwealth to enter into numerous IT services contracts, including the DL Contract, materially misstate the number of labor hours required to perform fixed-price work by inflating those hours. In so doing, Deloitte inflated the base fixed price of the Lot 6 and 7 contract to pad its profits.

205.   PADHS and the United States would quickly discover Deloitte's fraudulent bidding scheme, and would refuse to pay Deloitte's invoices, unless the number of hours Deloitte staff ostensibly spent on 16-09 projects track the hours identified in Deloitte's Proposals.

206.   For example, DL Contract, Final Contract Terms and Conditions, paragraph 9 provides in pertinent part:

> In determining whether or not the Contractor has performed with due diligence hereunder, it is agreed and understood that the Commonwealth may measure the amount

and quality of the Contractor's effort against the representations made in the Contractor Proposal.

207.   Thus, Defendants' routine submission of grossly inflated work hours in Work Orders is essential to Deloitte's scheme in that it camouflages the intentional and fraudulent bidding scheme.

208.   PADHS relied upon the accuracy and veracity of Deloitte's Proposal in awarding the Lots 6 and 7 contracts to Deloitte, and in submitting APD-related documents requesting FFP for Deloitte invoices.

209.   Indeed, Deloitte's failure to comply with the representations in its Proposal are designated in Paragraph 17(a)(14) of the Final Terms and Conditions of the DL Contract to constitute a material breach thereof and provides grounds for the Commonwealth to terminate the contract.

210.   As further evidence of Defendants' fraudulent bidding scheme, Deloitte's flagrantly inflated labor hours reported in Work Order estimates for fixed price work *precisely match*, down to the hour, the labor hours Deloitte sets forth in its invoices and its bid/proposal documents

**G.   The United States Has Been Damaged By Defendants' Fraudulent Conduct.**

211.   Defendants inflated the bids for Lots 6 and 7 in several material ways outlined *supra.* Therefore, each and every demand for payment in connection with the contracts flowing therefrom, is false and fraudulent.

212.   Even evaluating Defendants' invoices individually, Defendants systematically overbilled PADHS in work orders demanding payment under the 16-09 fixed price contract and in work orders demanding payment for add-ons such as M&Es, and contract amendments in the

46

manner set forth *supra* since commencing work on the 16-09 contracts on April 16, 2012. Those false billings are continuing unabated as of the date the Original Complaint is filed.

213.    As set forth above, the United States relied upon the false claims Deloitte submitted to PADHS in approving the Commonwealth's request for FFP to fund Defendants' IT services.

214.    Certainly, the United States, through USDHHS, would not have approved PADHS's request for FFP for Deloitte's services had the facts been known.

215.    Accordingly, Defendants' unlawful conduct bilked tens of millions of dollars from the US Treasury that they were not entitled to receive at the expense of the United States and the US Taxpayer,

### H.    Deloitte's Conflicts of Interest and Abuse of its Incumbency Position to Influence Commonwealth Contract Awards

216.    Defendants have provided IT Consulting services to the Commonwealth for more than four (4) decades.

217.    When Deloitte submitted its 16-09 Proposal I August 2010, Deloitte identified therein six (6) PADHS IT services projects current as of that time, which dated as far back as 1994.

218.    The scope of the Lots 6 and 7 of RFP 16-09 involved work on the very same computer systems on which Deloitte has worked under these contracts since 1993. In fact, Lots 6 and 7 are Commonwealth rebids of two (2) of Deloitte's expiring contracts.

219.    In Deloitte's own words, "[o]ur close collaboration with you as (sic) resulted in the implementation of eight major systems and a number of modifications. During our time working with you, we believe we have established a history of working as a cohesive unit with you – these implementations would not have been possible without it."

220.    This relationship with the Commonwealth and PADHS in particular has been a financial windfall for Defendants.  According to news media reports in 2010, Deloitte received nearly $1 billion from the Commonwealth, primarily for PADHS IT services projects, between 2000 and 2010.  This amount has increased exponentially since that time, after accounting for Deloitte's revenues under RFP # 16-09 Lots 6 and 7 contracts.  Deloitte commenced work on those contracts in April 2012, and the cost has ballooned from an initial $250 million to half a billion dollars ($500 million).

221.    Deloitte has provided consulting services to the Commonwealth for over three decades.  At any given time, Deloitte has multiple consulting services contracts with the Commonwealth of extended duration pursuant to which Deloitte has spent literally millions of hours working side by side with Commonwealth employees on an ongoing, continuous basis for a decade or possibly more.

222.    Indeed, in 2006, Deloitte unveiled its state of the art "Public Sector Delivery Center" in Camp Hill, PA concomitant with commencing work under the 16-05 and 39-06 contracts.  Deloitte's Camp Hill headquarters are ideally situated less than 5 ½ miles from the Commonwealth's offices.  The 72,534 square foot, 54 office facility is outfitted with every amenity necessary to service Commonwealth IT service contracts, including an established data communication service with the Commonwealth's Willow Park site which would enable Deloitte to be operational on Day One.

223.    Deloitte has purposefully forged cozy relationships with key Commonwealth employees, including those in a position to influence contract awards which Deloitte exploits for profit-driven motives.

224.    The working relationship between Deloitte and the Commonwealth has grown so enmeshed that it is not uncommon for Deloitte and PADHS to "swap" personnel from time to time, i.e., for Deloitte staff to seek employment with the Commonwealth, and vice-versa.

225.    By the time the Commonwealth claimed to reinvent its procurement strategy in time for the release of RFP #16-09, ostensibly to reduce reliance upon a single vendor, Deloitte was deeply entrenched as the Commonwealth's preferred IT vendor, to the virtual exclusion of its competitors.

226.    Testament to this fact is the astonishing revenues the company generated from Commonwealth contracts during 2000-2010.

227.    From 2000-2010, Deloitte generated nearly $1 billion in payments from the Commonwealth, principally in connection with IT consulting services contracts provided to PADHS.

228.    Moreover, in the four-year span from Jan. 1, 2004 to Dec. 31, 2007, the Commonwealth awarded Deloitte 84 contracts to provide IT services, worth $592 million.

229.    Ultimately, the events discussed herein reveal that Deloitte, acting alone or with the assistance of well-placed Commonwealth insiders, co-opted the award of the two largest contracts or 86% of the 16-09 Contract award.

230.    Based on the foregoing, coupled with inferences and information Relators have gleaned from documents, conversations, interactions and meetings involving PADHS and Deloitte staff, it is alleged that Deloitte, acting alone or in concert with willing cooperators, orchestrated its award of the Lot 6 and 7 contract.

1.    *Deloitte Abused its Position of Confidence as the Incumbent to Improperly Steer the Lots 6 and 7 Contract Awards*

231.    As is alleged supra, Deloitte RFP #16-09 was issued as a reprocurement of two then-effective contracts with base terms set to expire on June 30, 2011.   Deloitte was the incumbent contractor on both contracts.

232.    Incumbent vendors have an inherent edge in the reprocurement process.   An incumbent will have made investments in infrastructures in the service territory, thereby reducing if not eliminating the incumbent's transition and mobilization costs.   Further, the incumbent necessarily possesses a deep understanding of the work that is the subject of the RFP, the demand patterns for staffing purposes, and an ongoing relationship with the government. Incumbents further benefit from the inertia of bureaucratic decision makers, who are likely to be unenthusiastic about starting a new contractual relationship, which would involve changes in working methods and routines.   Thus, the incumbent's insight into future demand, organizational capabilities, and the true cost of production give it a built-in advantage over other bidders.

233.    As a consequence, regulatory and case law authority recognize the impracticality of ignoring the potential competitive edge held by an incumbent.   At some point, however, these advantages exceed the bounds of acceptability and, ultimately, amount to an unfair competitive advantage, such as when:

- *The incumbent assists in the preparation of future procurement requirements on which it intends to bid.*

   o   When an incumbent sets the parameters for competition for future government contracts by, for example, participating in any way in drafting an RFP or assisting a government official behind the scenes to draft an RFP, there is no corrective action that can be taken to mitigate the incumbent's conflict of interest short of barring the incumbent from bidding on the reprocurement.

- *The reprocurement requirements are so narrowly tailored to the qualifications of the incumbent such that the bid becomes a de facto sole-source award for the incumbent.*

  - o   Government officials with or without the assistance of the incumbent design the reprocurement bid requirements in an overly restrictive narrow way such that they constitute a de facto sole-source award for the incumbent, i.e., where the incumbent alone meets the criteria to perform the work subject to procurement.

- *The incumbent gains access to information unavailable to competing contractors that is material to the contract award, thereby giving the incumbent an unfair competitive advantage.*

  - o   Because incumbents' staff routinely work on a daily basis within government offices, they can advertently or inadvertently be exposed to, or even actively request or actively be told by government employees, sensitive inside information not available to competitors

234.   Additional concerns which naturally flow from a relationship such as the one between Deloitte and the Commonwealth necessarily include whether the Commonwealth unduly restricted Deloitte's competition on the Lots 6 and 7 rebids by unreasonably disfavoring vendors competing with Deloitte within the evaluation of competing bids or by virtue of the design and terms of RFP #16-09.

235.   That is not to say it is improper *per se* for a contracting officer to give greater weight to an incumbent's experience and particularized qualifications of his or her staff, because it is not; however a government officer may not evaluate competing bids with so much indifference that it effectively precludes others from competing.

2.   *Conflicts of Interest*

236.   The terms of RFP 16-09 required Deloitte to represent it had no conflicts of interest in connection with its proposal on RFP 16-09.  Deloitte was further required to represent that if, after award, a potential conflict of interest arose, it would immediately notify the OPM contracting officer.

237.  Upon information and belief, any representation by Deloitte that it had no conflicts of interest would have been knowingly false.

238.  Former Deloitte employees hold key positions of influence regarding contract awards within PADHS, and vice-versa, which taints the objectivity of the proposal award process, upon information and belief, as well as afford Deloitte access to information that unfairly and unduly advantaged Deloitte in connection with competitive bid proposals.

## VIII.  CLAIMS FOR RELIEF

### COUNT I

**Violations of the Federal False Claims Act,
31 U.S.C. §3729(a)(1) and 31 U.S.C. §3729(a)(1)(A) [9]
Presenting or Causing to be Presented False Claims**

1.  Relators re-allege and incorporate by reference each and every of the foregoing paragraphs as if fully set forth herein.

2.  This is a *qui tam* action brought by Relators on behalf of the United States to recover treble damages, civil penalties, and the cost of this action, under the Federal False Claims Act, 31 U.S.C. §3730 for Defendant's violations of 31 U.S.C. §3729 *et seq.*

3.  Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, false or fraudulent claims as defined by the FCA that were paid out of federal funds in violation of 31 U.S.C. § 3729(a)(1); 31 U.S.C. § 3729(a)(1)(A).

---

[9] For all unlawful conduct for which Defendants are liable under this Count that occurred on or before May 20, 2009, this Original Complaint should be deemed to include violations of the FCA prior to the FERA amendments, specifically, 31 U.S.C. §3729(a)(1).

4.      In carrying out these wrongful acts, Defendant engaged in a pattern of fraudulent conduct that was material (as defined by the FCA) to the United States' decision to pay these claims, which were false or fraudulent.

5.      Plaintiff United States, unaware of the falsity of the claims, and in reliance on the accuracy thereof, paid out federal funds to pay Defendants' false claims that would otherwise not have been paid.

6.      As a direct and proximate result of Defendant's fraudulent and/or illegal actions and pattern of fraudulent conduct, the United States has been, and continues to be, damaged.

7.      For those claims that Defendants submitted or caused to be submitted, it was foreseeable and, in fact, the intended result, that those claims would be submitted and paid with federal funds.  Further, at all times relevant to this Original Complaint, Defendants acted with the requisite scienter.

8.      As a result of Defendants' violations of 31 U.S.C. §3729 (a)(1)(A), Defendants are liable to pay treble damages under the False Claims Act, in an amount to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each such false claim presented or caused to be presented by Defendants.

9.      Relators FXH and SWS are private persons with direct and independent knowledge of the allegations of this Original Complaint, who have brought this action pursuant to the FCA on behalf of themselves individually and the United States.

## COUNT II

**Violations of the Federal False Claims Act,
31 U.S.C. §3729(a)(2) and 31 U.S.C. §3729(a)(1)(B) [10]
Creation or Use of False Statements or Records Material to a False Claim**

---

[10] For all unlawful conduct for which Defendants are liable under this Count that occurred on or before May 20, 2009, this Original Complaint should be deemed to include violations of the FCA prior to the FERA amendments, specifically, 31 U.S.C. §3729(a)(2).

10.     Relators and the United States re-allege and incorporate by reference each and every of the foregoing paragraphs as if fully set forth herein.

11.     This is a *qui tam* action brought by Relators on behalf of the United States to recover treble damages, civil penalties and the cost of this action, under the Federal False Claims Act, 31 U.S.C. §3730, for Defendants' violations of 31 U.S.C. §3729 *et seq*

12.     Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to the payment of false or fraudulent claims, in violation of 31 U.S.C. § 3729(a)(2); 31 U.S.C. § 3729(a)(1)(B).

13.     The United States, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid and is continuing to provide FFP for Defendants' IT services.

14.     For those records and/or statements that Defendant made or used or caused to be made or used, it was foreseeable and, in fact, the intended result that those statements and/or records would result in the payment of false claims for Defendants. Further, at all times relevant hereto, Defendants acted with the requisite scienter.

15.     The amounts of the false or fraudulent claims caused to be paid pursuant to Defendants' false records and statements made or used or caused to be made  to the United States were material to the payment of the false claims identified herein.

16.     As a result of Defendants' violations of 31 U.S.C. §3729 (a)(1)(B), the United States has suffered substantial losses, and, therefore, is entitled to treble damages under the False Claims Act, in an amount to be determined at trial, plus a civil penalty of $5,500 to $11,000 for

each such false record and/or statement made or used or caused to be made or used by Defendants.

17.     Relators FXH and SWS are private persons with direct and independent knowledge of the allegations of this Original Complaint, who have brought this action pursuant to the Federal False Claims Act on behalf of themselves and the United States.

## COUNT III

**Defendants' Violations of the Federal False Claims Act,
31 U.S.C. §3729(a)(7) and §3729(a)(1)(G)** [11]
**Making, Using or Causing to be Made or Used, a False Record or Statement
Material to an Obligation to pay or Transmit Money or Property to the United States or
Concealing, Improperly Avoiding or Decreasing an Obligation to Pay or Transmit Money
or Property to the United States**

18.     Relators re-allege and incorporate by reference each and every of the foregoing paragraphs as if fully set forth herein.

19.     This is a claim brought by Relators on behalf of United States to recover treble damages, civil penalties and the cost of this action under the Federal False Claims Act, 31 U.S.C. § 3730, for Defendants' violations of 31 U.S.C. § 3729 *et seq.*

20.     The Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(G) provides: "Liability for certain acts. Any person who—

(G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government ..."

*Id.* The term "obligation" means:

---

[11] For all unlawful conduct for which Defendants are liable under this Count that occurred on or before May 20, 2009, this Original Complaint should be deemed to include violations of the FCA prior to the FERA amendments, specifically, 31 U.S.C. §3729(a)(7).

"an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, form a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment..." 31 U.S.C. § 3729(b)(3).

21.    By virtue of the above-described acts, Defendants violated 31 U.S.C. § 3729(a)(1)(G).

22.    As a result of Defendants' violations of 31 U.S.C. § 3729 (a)(1)(G), the United States has suffered substantial losses in an amount that exceeds tens of millions of dollars, and therefore is entitled to treble damages under the False Claims Act, to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each such false record and/or statement made or used or caused to be made or used by Defendants.

23.    Relators FXH and SWS are private persons with direct and independent knowledge of the allegations of this Original Complaint, who have brought this action pursuant to the Federal False Claims Act on behalf of themselves and the United States.

## PRAYER FOR RELIEF

WHEREFORE, Relators acting on their own behalf, and on behalf of the United States, respectfully demand and pray that this Court enter judgment against Defendants as follows:

1.    that this Court enter judgment against Defendants in an amount equal to three (3) times the amount of damages the United States has sustained because of Defendants' actions, plus a civil penalty of not less than $5,500 and not more than $11,000 for each violation of 31 U.S.C. §3729 *et seq.*;

2.    that Relators be awarded the maximum amount of relator's share allowed pursuant to 31 U.S.C. §3730(d) of the Federal False Claims Act;

3.    that Relators be awarded all costs and expenses of this action, including attorneys'

fees;

4.    that the Relators and the United States be awarded pre-judgment interest;

5.    that the Relators be granted any and all other relief set forth in the False Claims

Act which was not specifically referenced above; and,

6.    that Relators recover such other relief as the Court deems just and proper, or that

is necessary to make each Relator whole.

## TRIAL BY JURY

Relators hereby demand a trial by jury as to all issues.

Respectfully Submitted

BRIAN P. KENNEY, ESQUIRE (Atty. ID 92944)
BRIAN P MCCAFFERTY, ESQUIRE (Atty. ID 66257)
M. TAVY SHEPHERD, ESQUIRE (Atty. ID. 83190)
**Kenney & McCafferty, P.C.**
1787 Sentry Parkway West,
Suite 410, Building 18
Blue Bell, PA 19422
(215) 367-4333
Email: bkenney@kenneymccafferty.com
        bmccafferty@kenneymccafferty.com
        tdeming@kenneymccafferty.com

AND

STEPHEN ROBERT LACHEEN, ESQUIRE
 (Atty. ID 2986)
ALEXANDRA L. LACHEEN, ESQUIRE
(Atty.ID 317856)
1429 Walnut Street, 13th Floor
Philadelphia, PA 19102
(215) 735-5900
Email: slacheen@slacheen.cnc.net

Attorneys for Relators Hetherington and Searle

DATED:  August 16, 2016